1    UNITED STATES BANKRUPTCY COURT
     SOUTHERN DISTRICT OF NEW YORK
2    - - - - - - - - - - - - - - - - - - x

3    In re:                              Chapter 11

4    MPM SILICONES, LLC, et al.,         Case No.

5              Debtors.                  14-22503-rdd

6    - - - - - - - - - - - - - - - - - - x

7    BOKF, N.A., Plaintiff,

8      - against -                       Adv. Proc. No.

9    JPMORGAN CHASE BANK, N.A., et al.    14-08247-rdd

10       Defendants.

11   - - - - - - - - - - - - - - - - - - -x

12   WILMINGTON TRUST, N.A., Plaintiff,

13     - against -                       Adv. Proc. No.

14   JPMORGAN CHASE BANK, N.A., et al.    14-08248-rdd

15       Defendants.

16   - - - - - - - - - - - - - - - - - - -x

17   **CORRECTED AND MODIFIED BENCH RULING ON DEFENDANTS' MOTIONS**
         **TO DISMISS PURSUANT TO FED. R. BANKR. P. 7012**

18

19   A P P E A R A N C E S :

20   MILBANK, TWEED, HADLEY & MCCLOY LLP
             Attorneys for Ad Hoc Committee of Second Lien Holders
21           One Chase Manhattan Plaza
             New York, NY 10005
22
     BY:   DENNIS F. DUNNE, ESQ.
23           MICHAEL L. HIRSCHFELD, ESQ.
             SAMUEL A. KHALIL, ESQ.
24
     SIMPSON THACHER & BARTLETT LLP
25           Attorneys for JPMorgan Chase

1          425 Lexington Avenue
           New York, NY 10017
2
     BY:   WILLIAM T. RUSSELL, JR., ESQ.
3

4    PRYOR CASHMAN LLP
           Attorneys for Wilmington Savings Fund Society, FSB
5           as Second Lien Indenture Trustee
           7 Times Square
6          New York, NY 10036

7    BY:   SETH H. LIEBERMAN, ESQ.
           PATRICK SIBLEY, ESQ.
8

     AKIN GUMP STRAUSS HAUER & FELD LLP
9          Attorneys for Apollo Global Management LLC
           One Bryant Park
10         New York, NY 10036

11   BY:   DEBORAH NEWMAN, ESQ.

12   IRELL & MANELLA LLP
           Attorneys for Bank of New York Mellon Trust Company
13         840 Newport Center Drive
           Suite 400
14         Newport Beach, CA 92660

15   BY:   JEFFREY M. REISNER, ESQ.
           MICHAEL H. STRUB, JR., ESQ.
16

     CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
17         Attorneys for Wilmington Trust, N.A.,
            as Trustee for the 1.5 Lien Noteholders
18         101 Park Avenue
           New York, NY 10178
19
     BY:   THERESA A. FOUDY, ESQ.
20

21   Hon. Robert D. Drain, United States Bankruptcy Judge

22         I have two motions before me to dismiss the largely

23   identical complaints of the so-called first lien trustee and

24   1.5 lien trustee under Bankruptcy Rule 7012, incorporating, in

25   this instance, Federal Rule of Civil Procedure 12(c), which

MPM SILICONES, LLC, ET AL.

1    provides for judgment on the pleadings.

2         The same standard applicable to motions to dismiss

3    pursuant to Federal Rule of Civil Procedure 12(b)(6) applies to

4    Rule 12(c) motions.  L-7 Designs, Inc. v. Old Navy, LLC, 647

5    F.3d 419, 429-30 (2d Cir. 2011).

6         In deciding these motions, therefore, the Court must

7    assess the legal feasibility of the complaints, not weigh the

8    evidence that might be offered in their support.  Koppel v.

9    4987 Corp., 167 F.3d 125, 133 (2d Cir. 1999).  The Court's

10   consideration is "limited to facts stated on the face of the

11   complaint and in the documents appended to the complaint or

12   incorporated into the complaint by reference, as well as to

13   matters of which judicial notice may be taken."  Hertz Corp. v.

14   City of New York, 1 F.3d 121, 125 (2d Cir. 1993), cert. denied,

15   510 U.S. 1111 (1994).  See also DiFolco v. MSNBC Cable, LLC,

16   622 F.3d 104, 111 (2d Cir. 2010) ("Where a document is not

17   incorporated by reference, the court may nevertheless consider

18   it where the complaint relies heavily upon its terms and

19   effect.").

20        The Court accepts the complaints' factual allegations

21   as true even if they are doubtful in fact and must draw all

22   reasonable inferences in favor of the plaintiffs. Tellabs Inc.

23   v. Makor Issues and Rights, Ltd., 551 U.S. 308, 321-23 (2007).

24   However, the Court need not accept a complaint's allegations

25   that are clearly contradicted by documents incorporated into

MPM SILICONES, LLC, ET AL.

1   the pleadings. <u>Labajo v. Best Buy Stores, LP</u>, 478 F.Supp.2d

2   523, 528 (S.D.N.Y. 2007).

3        Moreover, the Court is not bound to accept as true "a

4   legal conclusion couched as a factual allegation." <u>Papasan v.</u>

5   <u>Allain</u>, 478 U.S. 265, 286 (1986).  Instead, the complaint must

6   state more than "labels and conclusions, and a formulaic

7   recitation of the elements of a cause of action and not do."

8   <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007).

9        In addition, while the Supreme Court has confirmed, in

10   light of the notice pleading standard of Federal Rule of Civil

11   Procedure 8(a), that a complaint does not need detailed factual

12   allegations to survive a motion under Rule 12(b)(6) -- see

13   <u>Erickson v. Pardus</u>, 551 U.S. 89, 93 (2007), and <u>Twombly</u>, 550

14   U.S. at 555 -- its "factual allegations must be enough to raise

15   a right to relief above the speculative level."  <u>Twombly</u>, 550

16   U.S. at 555.  If the claim would not otherwise be plausible on

17   its face, therefore, the complaint must alleged sufficient

18   facts to "nudge the claim across the line from conceivable to

19   plausible." <u>Id.</u> at 570.  Otherwise, the defendant should not be

20   subjected to the burdens of continued discovery and the worry

21   of overhanging litigation. <u>Id.</u> at 556.

22        Applying this plausibility standard is a "context-

23   specific task that requires the reviewing court to draw on its

24   judicial experience and common sense." <u>Ashcroft v. Iqbal</u>, 556

25   U.S. 662, 679 (2009).  "Plausibility depends on a host of

MPM SILICONES, LLC, ET AL.

1   considerations:  the full factual picture presented by the

2   complaint, the particular cause of action and its elements, and

3   the existence of alternative explanations so obvious that they

4   render plaintiff's inferences unreasonable." L-7 Designs, Inc.

5   v. Old Navy, LLC, 647 F.3d at 430.

6         In sum, then, the Court applies a two-step approach

7   under Rule 12(c).  After identifying the elements of the

8   applicable causes of action -- Ashcroft v. Iqbal, 556 U.S. at

9   675 -- the Court must first note the allegations not entitled

10  to the assumption of truth because they are only legal

11  conclusions, id. at 679-80, and, second, it must assess the

12  factual allegations in context to determine whether they

13  plausibly suggest an entitlement to relief. Id. at 681.

14        Here, the complaints (which, again, are, with the

15  exception of an allegation about the nonpayment of a financial

16  advisor's fees, essentially the same) rely upon the plaintiffs'

17  rights under an Intercreditor Agreement, or ICA, a copy of

18  which is filed on the docket and has also been attached to the

19  declaration of Samuel A. Khalil in support of defendants' reply

20  in support of their motions.

21        The complaints assert claims for various alleged

22  breaches of the Intercreditor Agreement.  They also seek

23  declaratory relief regarding the meaning of the ICA and

24  injunctive relief against future breaches.  Finally, the

25  complaints assert a breach of the implied covenant of good

MPM SILICONES, LLC, ET AL.

1    faith and fair dealing.

2         As the parties acknowledge, the Intercreditor

3    Agreement is governed by New York law, which, with respect to

4    the interpretation of contracts like the ICA, is clear.  Under

5    New York law, the best evidence, and, if clear, the conclusive

6    evidence, of the parties' intent is the plain meaning of the

7    contract.  Thus, in construing a contract under New York law,

8    the Court should look to its language for an agreement that is

9    complete, clear, and unambiguous on its face; and, if that is

10   the case, it must be enforced according to its plain terms.  J.

11   D'Addario & Company Inc. v. Embassy Industries, Inc., 20 N.Y.3d

12   113, 118 (2012); Greenfield v. Philles Records Inc., 98 N.Y.2d

13   562, 569 (2002).

14        Ambiguity is a question of law.  Consedine v.

15   Portville Cent. School District, 12 N.Y.3d 286, 294 (2009).  A

16   contract is ambiguous if its terms are "susceptible to more

17   than one reasonable interpretation."  Evans v. Famous Music

18   Corp., 1 N.Y.3d 452, 458 (2004).  See also British

19   International Insurance Company v. Seguros La Republica, S.A.,

20   342 F.3d 78, 82 (2d Cir. 2003), in which the court states, "An

21   ambiguity exists where the terms of the contract could suggest

22   more than one meaning when viewed objectively by a reasonably

23   intelligent person who has examined the context of the entire

24   integrated agreement and who is cognizant of the customs,

25   practices, usages and terminology as generally understood in

MPM SILICONES, LLC, ET AL.

1   the particular trade or business."

2       Thus, while in instances of ambiguity the Court may

3   look to parol evidence, if the agreement on its face is

4   reasonably susceptible to only one meaning, that meaning

5   governs; the Court is not free to alter the contract to reflect

6   its notions of fairness or equity or extrinsic facts.

7   Greenfield v. Philles Records, Inc., 98 N.Y.2d at 569.  See

8   also In re AMR Corp., 730 F.3d 88, 98 (2d Cir. 2013).

9       In construing a contract, one should be aware that an

10  entire agreement is being examined, and, therefore, the Court

11  should interpret the contract to give full meaning and effect

12  to all of its provisions.  Id. at 98.  An isolated provision

13  that might be susceptible to one or more readings thus should

14  not be taken out of context but should be read, instead, in the

15  context of the entire agreement, or construed in a way that is

16  plausible in the context of the entire agreement.  See Barclays

17  Capital, Inc. v. Giddens, 761 F.3d 303 (2d Cir. 2014).

18      Here, as I noted, the parties are disputing the

19  defendants' obligations under the Intercreditor Agreement

20  attached as an exhibit to Mr. Khalil's declaration.  As I noted

21  in my previous ruling on confirmation of the debtors' chapter

22  11 plan, the ICA is very clearly an intercreditor agreement

23  pertaining to the parties' rights in respect of shared

24  collateral.  That is the overall context of the Agreement, and

25  it is in that context that the complaints' claims should be

MPM SILICONES, LLC, ET AL.

1    evaluated.

2         The complaints allege that the defendants breached the

3    Intercreditor Agreement by taking positions before and during

4    the course of this bankruptcy case in opposition to the

5    plaintiffs.  More specifically, the complaints assert that the

6    defendants breached the ICA (a) by entering into a

7    Restructuring Support Agreement before the commencement of the

8    case in favor of what eventually became the debtors' chapter 11

9    plan and then supporting confirmation of that plan, which the

10   complaints allege adversely treats the plaintiffs by "cramming

11   down" the plaintiffs' claims under section 1129(b) of the

12   Bankruptcy Code, and (b) by intervening support of the debtors'

13   objections to the plaintiffs' right to a make-whole payment

14   under their indentures and notes and similar claims based on

15   the prepayment of their debt.

16        The plaintiffs also contend that the defendants

17   breached the Intercreditor Agreement (a) by supporting the

18   debtors' financing (apparently, although not expressly stated

19   in the complaints, the postpetition or "DIP" financing under

20   section 364 of the Bankruptcy Code as approved by the Court)

21   that was given a lien with priority over the plaintiffs' liens,

22   and (b) by opposing the plaintiffs' requests for adequate

23   protection of their interests in the shared collateral and, as

24   more specifically alleged in the first lien trustee's

25   complaint, objecting to the ongoing reimbursement of the first

MPM SILICONES, LLC, ET AL.

1   lien trustee's financial advisor's fees and expenses during the

2   course of this case as a proposed form of adequate protection

3   of the trustee's lien.

4        Lastly, and perhaps most significantly for purposes of

5   the underlying economics of this litigation, the complaints

6   allege that the defendants breached the Intercreditor Agreement

7   by agreeing to receive in return for their secured claims

8   property that the plaintiffs contend constitutes "Common

9   Collateral," a defined term in the Intercreditor Agreement, or

10  the proceeds thereof, while holding that property in trust for

11  the plaintiffs until the plaintiffs' "Senior Lender Claims" --

12  another defined term in the Agreement -- have been paid in full

13  in cash.

14       The Common Collateral or its proceeds allegedly

15  improperly retained by the defendants as secured creditors

16  includes (a) a potential $30 million charge under a Backstop

17  Agreement pursuant to which defendants agreed to backstop a

18  $600 million rights offering to partially fund the chapter 11

19  plan, (b) the fees and expenses of various counsel and

20  financial advisors for the plaintiffs that the debtors have

21  reimbursed on an ongoing basis during the course of this case,

22  which apparently (although I am not prepared to find this

23  conclusively for reasons discussed below) were paid pursuant to

24  the Restructuring Support Agreement between the debtors and

25  defendants that was eventually approved by the Court, although

MPM SILICONES, LLC, ET AL.

1    possibly also paid as a form of adequate protection of the

2    defendants' interests in the shared collateral, and (c) 100

3    percent of the common stock of the reorganized parent debtor,

4    to be distributed to the defendants under the chapter 11 plan

5    in exchange for their claims against the debtors.

6         The complaints rarely, if ever, specify the provisions

7    of the Intercreditor Agreement that are claimed to have been

8    breached by the foregoing conduct.  I have reviewed the ICA,

9    therefore, to see what provisions might apply and also

10   requested counsel during oral argument to highlight the

11   provisions that they believe apply.

12        Let me address first the complaints' claims based on

13   the defendants' alleged objections to the plaintiffs' receipt

14   of adequate protection of their interests in the shared

15   collateral and the claims based on the defendants' alleged

16   support of a priming lien. Section 6.3 of the ICA provides, "No

17   Second-Priority Party [which admittedly would include the

18   defendants] will contest or support any other person contesting

19   (a) any request by the Senior Lenders for adequate protection,

20   or (b) any objection by the Senior Lenders to any motion based

21   on the Senior Lenders' claiming a lack of adequate protection."

22        The first lien trustee's complaint alleges in a

23   conclusory fashion that the defendants either contested or

24   supported other persons in objecting to the first lien holders'

25   right to adequate protection of their liens in the shared

MPM SILICONES, LLC, ET AL.

1   collateral.  The complaint's only non-conclusory assertion of

2   such conduct is its allegation that the defendants objected to

3   the current payment, as a form of adequate protection, of the

4   fees and expenses of the financial advisor for the first lien

5   trustee.  The complaint does not state, however, how the

6   defendants raised such an objection.  I am not aware of any

7   such action taken by the defendants in court, moreover, and

8   such an objection does not appear on the docket.  I conclude,

9   therefore, that the first lien trustee's complaint does not

10   satisfy the initial requirement of Twombly, Iqbal and L-7

11   Designs, namely, that on this claim it states no more than a

12   conclusory recitation of the cause of action.  The 1.5 lien

13   trustee's complaint lacks even the allegation of an objection

14   by the defendants to any specific aspect of proposed adequate

15   protection; therefore, it, too, fails the first prong of

16   Twombly, Iqbal and L-7 Designs and does not assert a claim for

17   breach of section 6.3 of the ICA.

18           I could go further, as the defendants also request,

19   and hold that under no circumstances would the defendants'

20   objection to the provision of adequate protection of the

21   plaintiffs' interests in the shared collateral, including in

22   the form of reimbursement of advisors' fees, ever give rise to

23   a cause of action for breach of section 6.3 of the ICA, but I

24   am reluctant to do so without seeing more of what the

25   defendants are alleged to have done to breach that provision.

MPM SILICONES, LLC, ET AL.

1      To persuade me otherwise, the defendants rely heavily

2   on a decision that also construed an intercreditor agreement

3   pertaining to the rights of secured creditors in shared

4   collateral, In re Boston Generating LLC, 440 B.R. 302 (Bankr.

5   S.D.N.Y. 2010).  The agreement at issue in that case, like the

6   ICA, expressly acknowledged the right of the junior, or second-

7   priority lien holders to assert their rights as unsecured

8   creditors; and Judge Chapman concluded, based on her finding

9   that the junior lien holders' allegedly wrongful conduct

10   comprised no more than the assertion of rights available to

11   unsecured creditors, that such holders were not prohibited from

12   objecting to a sale of the shared collateral that was supported

13   by the senior lien holders notwithstanding other provisions in

14   the agreement that precluded them from taking actions contrary

15   to the senior lien holders' rights in the collateral (although

16   she found it "a very close call").  Id. at page 320.

17      Here, the ICA's provision permitting the second-

18   priority secured parties to act in their capacity as unsecured

19   creditors is quite broad, and, as in Boston Generating, the

20   plaintiffs concede that the defendants have a substantial

21   unsecured, deficiency claim under section 506(a) of the

22   Bankruptcy Code, that is, that the defendants also are

23   unsecured creditors with rights to assert under the provision.

24   Section 5.4 of the Intercreditor Agreement, titled "Rights as

25   Unsecured Creditors," provides, "Notwithstanding anything to

MPM SILICONES, LLC, ET AL.

1    the contrary in this Agreement, the Second-Priority Agents and

2    the Second-Priority Secured Parties may exercise rights and

3    remedies as an unsecured creditor against the Company or any

4    Subsidiary that has guaranteed the Second-Priority Claims in

5    accordance with the terms of the applicable Second-Priority

6    Documents and applicable law." (Emphasis added.)  The

7    defendants argue that this provision trumps ICA section 6.3's

8    prohibition of objections to any request by the senior

9    lienholders for adequate protection, because such an objection

10   to the debtors' proposed grant of adequate protection could be

11   equally raised by an unsecured creditor.

12        I can see a possible plausible reading of ICA section

13   5.4, however, that might require a more nuanced approach to

14   actions of the second lien holders that conflict with other

15   provisions of the ICA.  For example, if the debtors were

16   advocating a reasonable treatment of the first and 1.5 lien

17   holders' interests in the shared collateral that the second

18   lien holders opposed, once could question whether the second

19   lien holders were exercising "rights and remedies . . . against

20   the [debtors]" as required by the exemption in ICA section 5.4,

21   because the debtors were doing nothing objectionable. Judge

22   Chapman made a similar observation in Boston Generating, 440

23   B.R. at 320, distinguishing the junior lien holders' conduct in

24   that case from the "obstructionist behavior of the junior lien

25   holder in Ion Media Networks, Inc. v. Cyrus Select

MPM SILICONES, LLC, ET AL.

1   Opportunities Master Fund Ltd., 419 B.R. 585, 588-89, 595-95

2   (Bankr. S.D.N.Y. 2009), app. dismissed, 480 B.R. 494 (S.D.N.Y.

3   2012). In other words, ICA section 5.4, when read in context

4   with other provisions of the ICA, may require the junior lien

5   holders to assume the risk that they do not have a valid

6   argument to oppose the debtors' proposed action.  However, not

7   having sufficient facts stated in the complaints, I am not

8   prepared to rule either way on this point.  Thus, I will simply

9   hold that any claim in either complaint based upon an alleged

10  breach of ICA section 6.3 is dismissed on the ground that, as

11  pled, such claim does not pass the first test of Twombly, Iqbal

12  and L-7 Designs, having been asserted in a merely conclusory

13  fashion that leaves both the defendants and the Court guessing

14  at the claim's factual basis.

15       The complaints' claim based on the defendants' support

16  of a priming lien in a third-party financing also fails to

17  state what actions the defendants took to support the issuance

18  of such a lien.  Moreover, the complaints' failure to identify

19  the particular section of the Intercreditor Agreement allegedly

20  breached takes on greater significance because, based on my

21  review, the ICA nowhere prohibits junior lien holders from

22  supporting a priming lien financing, and counsel have not

23  identified one.  In fact, it appears that the only prohibition

24  in the ICA relating to priming liens bars objections to such

25  liens that are supported by the senior lien holders.

1          The plaintiffs acknowledged at oral argument,

2     moreover, that they never objected to the priming lien in the

3     DIP financing and stated that they view this claim as being

4     more akin to their other unspecified claims for breach of ICA

5     section 6.3, namely, that it relates to unspecified objections

6     to the provision of adequate protection to the senior lien

7     holders' interests in the shared collateral that arose in the

8     context of the debtors' motion for approval of the DIP

9     financing. This, of course, makes the claim even more nebulous.

10          Therefore, for the same reasons that I dismissed the

11     complaints' claim based upon ICA section 6.3, I will also

12     dismiss any claim based upon alleged support for the issuance

13     of a new priming lien, although I reiterate that the factual

14     support in the record -- and obviously I can take judicial

15     notice of the docket of this case -- as well as any support for

16     this claim in the ICA, other than, arguably, if facts are

17     further pled to fit it into section 6.3 of the ICA, is lacking.

18          Next, the complaints assert claims that the defendants

19     have violated the Intercreditor Agreement by supporting (a) the

20     debtors' objection to the first and 1.5 lien holders' right to

21     a make-whole payment or similar claim based on the plan's

22     prepayment of their debt, and (b) confirmation of the debtors'

23     chapter 11 plan over the plaintiffs' objections on a cramdown

24     basis.  As to the first claim, the plaintiffs have conceded

25     that if the Court's ruling disallowing their make-whole right

MPM SILICONES, LLC, ET AL.

1   as a matter of New York law becomes a final order, they would

2   not have a claim for breach of the ICA based on the defendants'

3   support of the debtors' position on the issue.  I believe the

4   same logic would apply to the defendants' support of the

5   debtors' objection (a) to the plaintiffs' claim under New York

6   law based on a non-call right, which I found in the same ruling

7   the plaintiffs lack because there is no specific non-call

8   provision in their indentures and notes, and (b) to the

9   plaintiffs' claim based on the debtors' alleged breach of New

10  York's rule of perfect tender, which precludes any prepayment

11  of a note.

12          There is no final order in this case on these issues,

13  as they are subject to pending appeals.  However, I believe

14  that in reviewing the complaints I should follow my prior

15  rulings, which are the law of the case, on the plaintiffs' lack

16  of either a make-whole right or a non-call claim under New York

17  law and, therefore, find, as conceded, that the ICA has not

18  been breached by the defendants' support of the debtors' claim

19  objections.  I also believe, although not having expressly

20  found before, that the make-whole provisions in the first and

21  1.5 lien indentures and notes modified New York's rule of

22  perfect tender, and, therefore, that the plaintiffs would not

23  have a claim under New York law for breach of that rule, which

24  is modifiable by contract, either.  See U.S. Bank National

25  Association v. South Side House, LLC, 2012 U.S. Dist. LEXIS

MPM SILICONES, LLC, ET AL.

1 10824, at *12-13 (E.D.N.Y. Jan. 30, 2012); Northwestern Mutual

2 Life Ins. Co. v. Uniondale Realty Assoc., 816 N.Y.S.2d 831,

3 835, 11 Misc.3d 980, 984 (N.Y. Sup. Ct. 2006; see generally

4 Charles & Kleinhaus, "Prepayment Claims in Bankruptcy," 15 Am.

5 Bankr. Inst. L. Rev. 537, 541 (Winter 2007).  (My prior

6 decision on the plaintiffs' right to such a claim was not based

7 on that conclusion because I found that the claim would not be

8 allowed, in any event, under sections 502(b)(2) and 506(b) of

9 the Bankruptcy Code.) Thus, by supporting the debtors'

10 objections to these claims, the defendants did no more than

11 ensure that the debtors objected to claims that do not exist

12 under state law; as conceded by the plaintiffs, the defendants

13 cannot be liable under the ICA for objecting to invalid claims.

14   There are other, alternative reasons, moreover, why

15 the complaints fail to assert a claim based on the defendants'

16 objections to the make-whole and related claims and their

17 support of confirmation of the debtors' plan.  First, however,

18 it is important to reiterate the context of the Intercreditor

19 Agreement, which is well summarized in Boston Generating:

20   Interpreting text requires some discussion and
understanding of context.  If one were to explain, in

21 lay terms, the purpose and function of an
intercreditor agreement between first lien parties

22 and second lien parties, the explanation would
include the notion, as the first lien agent stated,

23 that first lien lenders would be 'in the driver's
seat' when it came to decisions regarding collateral.

24 In other words, or to use a different metaphor, the
second lien lenders agree not to use their

25 subordinated lien as an offensive weapon against

MPM SILICONES, LLC, ET AL.

1     first lien lenders with respect to collateral.
Notwithstanding their agreement to be subordinated,

2     second lien lenders do retain certain rights under a
typical intercreditor agreement, including the right

3     to appear and be heard in a bankruptcy case as
unsecured creditors.  This right includes making

4     arguments that an unsecured creditor would have the
standing (and the economic interest) to assert and

5     those arguments that are not expressly waived by the
intercreditor agreement.

6

7    440 B.R. 318.  I made a similar observation about the ICA's

8    context in my confirmation ruling.

9        Judge Chapman also states in Boston Generating -- and

10   I believe this view is appropriate both under section 510(a) of

11   the Bankruptcy Code, which enforces subordination agreements,

12   and the law of New York -- that waivers of a secured creditor's

13   rights under such agreements "must be clear beyond

14   peradventure."  Id. at 319.

15       The focus, therefore, of an intercreditor agreement

16   between two groups of secured lenders, such as the one at issue

17   here, is on their rights in and remedies in respect of the

18   shared collateral.  That context helps explain what is,

19   frankly, clear language in the ICA, in any event, to the extent

20   it pertains to the types of actions that are at issue in this

21   aspect of my ruling.  Unlike actions directly pertaining to

22   adequate protection, which directly affect the secured

23   creditors' interests in the shared collateral, the defendants'

24   objections to the amount of the senior lien holders' claims

25   under applicable law, whether it be New York or bankruptcy law,

MPM SILICONES, LLC, ET AL.

1   and support of the debtors' cramdown chapter 11 plan -- unless

2   very clearly precluded or constrained by an intercreditor

3   agreement of this nature, should not be curtailed.  They are

4   not positions taken with respect to the parties' rights in the

5   shared collateral; instead, they pertain to the amount and

6   treatment of the senior lien holders' claims based on arguments

7   that any unsecured creditor could reasonably make.

8          Here the language relied upon by the plaintiffs is not

9   the specific language of ICA section 6.3 but a broad reading of

10  section 3.1(c) of the ICA, which provides that

11         Each Second-Priority Agent, for itself and on behalf
           of each applicable Second-Priority Secured Party,
12         agrees that no Second-Priority Agent or Second-
           Priority Secured Party will take any action that
13         would hinder any exercise of remedies undertaken by
           the Intercreditor Agent or the Senior Lenders with
14         respect to the Common Collateral under the Senior
           Lender Documents, including any sale, lease,
15         exchange, transfer or other disposition of the Common
           Collateral, whether by foreclosure or otherwise; and
16         each Second-Priority Agent, for itself and on behalf
           of each applicable Second-Priority Secured Party,
17         hereby waives any and all rights it or any Second-
           Priority Secured Party may have as a junior lien
18         creditor or otherwise to object to the manner in
           which the Intercreditor Agent or the Senior Lenders
19         seek to enforce or collect the Senior Lender Claims
           or the Liens granted in any of the Senior Lender
20         Collateral, regardless of whether any action or
           failure to act by or on behalf of the Intercreditor
21         Agent or Senior Lenders is adverse to the interests
           of the Second-Priority Secured Parties.

22
    (Emphasis added.)
23
           As I've stated, ICA section 5.4, however, provides
24
    that, "Notwithstanding anything to the contrary in this
25

MPM SILICONES, LLC, ET AL.

1   Agreement, the Second-Priority Agents and the Second-Priority

2   Secured Parties may exercise rights and remedies as an

3   unsecured creditor against the Company or any Subsidiary that

4   has guaranteed the Second-Priority Claims in accordance with

5   the terms of the applicable Second-Priority Documents and

6   applicable law."

7           With regard to the defendants' objections to the

8   plaintiffs' make-whole and similar claims, then, it appears

9   clear to me -- and the ICA, I believe, is unambiguous on this

10  point -- that the defendants were not acting contrary to

11  section 3.1(c) of the Intercreditor Agreement, which pertains

12  to objecting the plaintiffs' enforcement and exercise of

13  remedies in respect of the Common Collateral.  It is true that

14  those remedies are to be enforced pursuant to the underlying

15  documents, which, among other things, serve as the basis for

16  the senior lien holders' claims, but the ICA in general, and

17  section 3.1(c) in particular, is not a claim or debt

18  subordination agreement.  Its focus generally and in section

19  3.1(c) in particular is on the secured lenders' enforcement of

20  their remedies in the collateral, not on the amount of the

21  lenders' claims.  Thus, objecting to the amount of the

22  plaintiffs' claims would not give rise to a breach of ICA

23  section 3.1(c) even if such objection was ultimately denied

24  (which, of course, has not occurred here).

25          As I noted, the debtors already took the position that

1    the secured lenders were not entitled to a make-whole or

2    similar claim.  Thus it seems to me that the only claim the

3    plaintiffs might assert against the defendants under section

4    3.1(c) would be based on their having egged on the debtors to

5    object, or causing the debtors to do so, but, again, that would

6    be consistent with the defendants' rights against the debtors

7    under ICA section 5.4 to ensure that the debtors have acted

8    properly, as fiduciaries to unsecured creditors, in objecting

9    to claims that arguably do not have a basis in law.

10          A similar analysis was undertaken by Judge Chapman in

11   Boston Generating, although the senior lien holders'

12   representative there conceded that the lien holders were not

13   effecting or taking enforcement actions in respect of the

14   shared collateral when supporting the proposed sale, whereas

15   the plaintiffs have not so conceded here.  But that distinction

16   is less significant than the fact that the defendants' claim

17   objection was just that, a claim objection, rather than

18   opposition to the plaintiffs' pursuit of remedies in respect of

19   the shared collateral.  In this context ICA section 5.4 must be

20   read to give the defendants the unfettered right to act as

21   unsecured creditors to object to the senior lien holders'

22   claims.  Such actions would not conflict with any more specific

23   provision in the ICA in a way that might create any contextual

24   ambiguity.

25          The complaints' claim based on the defendants' support

MPM SILICONES, LLC, ET AL.

1    of the cramdown plan is a closer question, in that cramdown

2    under section 1129(b) of the Bankruptcy Code affects the manner

3    in which the senior lien holders will be paid under the plan,

4    not the amount of their claim.  Thus, arguably, by supporting a

5    cramdown plan the defendants were opposing the senior lien

6    holders' enforcement of their lien rights in the bankruptcy

7    case.

8            Again, however, the debtors advocated cramdown in any

9    event.  Thus, to the extent that the complaints could assert a

10   claim a based on the defendants' support of the debtors'

11   cramdown plan, it would, again, be based upon the defendants'

12   encouragement of the debtors to proceed on that course.  This I

13   believe, however, was permitted by ICA section 5.4.  The

14   debtors' pursuit of the cramdown plan was, as I found at least,

15   proper under the Bankruptcy Code and applicable precedent at

16   the Supreme Court and Second Circuit level and, therefore, I

17   believe that the defendants' encouragement of that course was

18   the type of action, consistent with Boston Generating and in

19   contrast with Judge Chapman's citation to Ion Media, that any

20   unsecured creditor would rightly take. It was not a holdup; it

21   was, instead, consistent with ICA section 5.4, merely ensuring

22   that the debtors acted properly in the interests of unsecured

23   creditors in not overpaying the plaintiffs with a higher

24   present value rate under section 1129(b)(2)(A)(i)(II) of the

25   Bankruptcy Code.

1        Therefore, as an alternative basis for dismissing both

2   of these claims, I conclude that the defendants' actions in

3   support of the debtors' proper exercise of their duties to

4   unsecured creditors with regard to the make-whole claim and the

5   cramdown plan were permitted under section 5.4 of the

6   Intercreditor Agreement.

7        In this regard, the loosely drafted ICA is quite

8   different than the agreement in In re Erickson Retirement

9   Communities LLC, 425 B.R. 309, 313 (Bankr. N.D. Tex. 2010),

10  which contained very tight language prohibiting the junior lien

11  holders from taking almost every action against the general

12  interests of the senior secured party -- where the junior lien

13  holders would, in the court's phrase, be "silent seconds" and

14  yield in all respects to the senior lien holder until the claim

15  of the senior lien holder was fully satisfied.   Id. at 314.

16  Clearly, more was required here to have rendered the defendants

17  silent on these types of issues.

18        Lastly, the complaints allege that the defendants have

19  breached section 4.2 of the Intercreditor Agreement by

20  receiving and retaining, or supporting a chapter 11 plan under

21  which they will receive and retain, (a) a possible $30 million

22  charge under the Backstop Agreement in connection with the $600

23  million rights offering, (b) ongoing cash reimbursement of

24  their professional fees, and (c) in return for their secured

25  and unsecured claims, their distribution under the confirmed

MPM SILICONES, LLC, ET AL.

1   plan in the form of 100 percent of the new common stock of the

2   reorganized parent debtor.  It is alleged that the defendants'

3   retention of these three forms of consideration violates

4   paragraph 4.2 of the ICA, which states,

5         Application of Proceeds.  After an event of default
          under any First lien Indebtedness has occurred with
6         respect to which the Intercreditor Agent has provided
          written notice to each Second-Priority Agent, and
7         until such event of default is cured or waived, so
          long as the Discharge of Senior Lender Claims has not
8         occurred, the Common Collateral or proceeds thereof
          received in connection with the sale or other
9         disposition of, or collection on, such Common
          Collateral upon the exercise of remedies, shall be
10        applied by the Intercreditor Agent to the Senior
          Lender Claims in such order as specified in the
11        relevant Senior Lender Documents until the Discharge
          of Senior Lender Claims has occurred.

12
13  (Emphasis added.)

          As relevant, the ICA defines "Discharge" as the
14
    "payment in full in cash (except for contingent indemnities and
15
    cost and reimbursement obligations to the extent no claim has
16
    been made) of (a) all Obligations in respect of all outstanding
17
    First Lien Indebtedness."  (Emphasis added.)  Under the chapter
18
    11 plan, the first lien and 1.5 lien holders are not being paid
19
    all of their Obligations in cash; they are instead receiving
20
    cramdown notes, with their liens continuing to attach to all of
21
    their prepetition collateral, i.e., cramdown treatment under
22
    section 1129(b)(2)(A)(i) of the Bankruptcy Code.
23
          The plaintiffs' argument that they are entitled to
24
    receive any distributions made to the second lien holders until
25

MPM SILICONES, LLC, ET AL.

1    the senior lien holders are paid in full in cash hinges on,

2    then, the plain language of section 4.2 of the ICA coming into

3    play upon the second lien holders' receipt of any "Common

4    Collateral or proceeds thereof . . . in connection with the . .

5    . disposition of, or collection on, such Common Collateral upon

6    the exercise of remedies."  The plaintiffs argue that all three

7    forms of the foregoing consideration received or to be received

8    by the defendants constitute "Common Collateral or the proceeds

9    thereof" received by the defendants as second lien holders "in

10   connection with the disposition of, or collection on, such

11   Common Collateral upon the exercise of remedies" and therefore

12   should be turned over to the plaintiffs until the plaintiffs

13   are paid in full in cash.

14           I conclude, however, that the motions should be

15   granted and the claims dismissed with respect to the $30

16   million charge under the Backstop Agreement.  While that cash

17   could be viewed as Common Collateral (although all parties

18   recognize that such collateral does not comprise all of the

19   debtors' assets), the payment, if made, will be based on the

20   defendants' rights under the Backstop Agreement, not in respect

21   of remedies as secured creditors. Such payment would not be on

22   account of a secured obligation but, rather, a separate,

23   unsecured obligation undertaken by the debtors to the

24   defendants for backstopping new exit financing for the debtors

25   beyond the time provided in the Backstop Agreement.  The

MPM SILICONES, LLC, ET AL.

1    defendants therefore would not be exercising remedies as

2    secured creditors against the Common Collateral for purposes of

3    triggering ICA section 4.2 if they receive the $30 million.

4           I cannot discern the basis for the defendants' right

5    to be reimbursed their professional fees currently during this

6    case, because the complaints do not it make clear and no party

7    has identified it in documents that I may consider in

8    connection with these motions. Indeed, there may be more than

9    one source for the defendants' right to such payments,

10   including (a) under the Court-approved Restructuring Support

11   Agreement in the form of an unsecured administrative expense,

12   which, as not deriving from the exercise of remedies against

13   the Common Collateral, may not support a claim under section

14   4.2 of the Intercreditor Agreement, and/or (b) as part of the

15   provision of adequate protection of the defendants' lien, which

16   arguably would violate section 4.2.  Unlike with respect to my

17   ruling on the complaints' claim based on the $30 million

18   payment under the Backstop Agreement, therefore, I am not

19   prepared to rule, as the defendants request, that their right

20   to retain such fees is under no scenario a right implicated by

21   their exercise of a remedy relating to the Common Collateral

22   and, therefore, under no circumstances, a breach of ICA section

23   4.2.

24          On the other hand, the complaints' failure to specify

25   the grounds on which the defendants have retained their ongoing

MPM SILICONES, LLC, ET AL.

1    professional fee reimbursements requires the dismissal of the

2    claim under Twombly, Iqbal and L-7 Designs.  The defendants and

3    the Court are forced to guess the basis for the claim (or, more

4    aptly, whether any facts show that the defendants received

5    their professional fee reimbursements in the exercise of their

6    remedies with respect to the Common Collateral).  Therefore, I

7    will dismiss the claim under ICA section 4.2 for the

8    defendants' retention of payment of professional fees on that

9    basis.

10          The common stock in the newly reorganized debtor that

11   the defendants are to receive under the chapter 11 plan is

12   concededly not Common Collateral.  Neither the first, 1.5, nor

13   second lien holders have a lien on that stock.  (Nor do they

14   have a lien on the parent corporation's current stock.)

15   Accordingly, the plaintiffs cannot argue that section 4.2 has

16   been breached by the defendants' retention of stock distributed

17   to them under the plan on the basis that it is Common

18   Collateral.

19          The plaintiffs argue, however, that the new stock

20   distributed under the plan constitutes "proceeds" of the Common

21   Collateral as used in the phrase "any Common Collateral or

22   proceeds thereof received by any Second-Priority Secured Party"

23   in ICA section 4.2.  They rely on the definition of "proceeds"

24   in section 9-102(a)(64) of the New York U.C.C., which was

25   enacted in 2001 to expand on, and resolve ambiguities in, the

MPM SILICONES, LLC, ET AL.

1    definition of "proceeds" in former U.C.C. section 9-306.

2    Official Comment to U.C.C. section 9-102(a), par. 13.

3         U.C.C. section 9-102(a)(64) includes the following

4    property as "proceeds":  "(A) [w]hatever is acquired upon the

5    sale, lease, license, exchange, or other disposition of

6    collateral; (B) whatever is collected on, or distributed on

7    account of, collateral; (C) rights arising out of collateral;

8    (D) to the extent of the value of collateral, claims arising

9    out of the loss, nonconformity, or interference with the use

10   of, defects or infringement of rights in, or damage to, the

11   collateral; or (E) to the extent of the value of collateral and

12   to the extent payable to the debtor or the secured party,

13   insurance payable by reason of the loss or nonconformity of,

14   defects or infringement of rights in, or damage to, the

15   collateral."

16        The plaintiffs contend that the defendants are being

17   distributed new stock under the plan "on account of" the Common

18   Collateral (or at least on account of a portion of the

19   collateral, as it is acknowledged that a significant amount, in

20   fact the majority, of the second lien holders' claims are

21   unsecured, deficiency claims), or that the distribution of the

22   stock is in respect of "rights arising out of" Common

23   Collateral, and, therefore, that such stock constitutes

24   proceeds of the Common Collateral for purposes of U.C.C.

25   section 9-102(a)(64).

MPM SILICONES, LLC, ET AL.

1          As a matter of law, however, I conclude that the new

2     stock to be distributed to the defendants under the plan is not

3     proceeds of the Common Collateral for purposes of New York

4     U.C.C. section 9-102(a)(64), or, for that matter, any other

5     definition of collateral proceeds.  From the perspective of the

6     debtors, that stock is not something that any currently secured

7     party's existing lien would attach to even under the expansive

8     definition of "proceeds" in section 9-102(a)(64), because the

9     new common stock comprises proceeds of the <u>defendants'</u> liens

10    and claims, not the proceeds of the <u>debtors'</u> assets that

11    constitute the Common Collateral.  It is being received

12    therefore on account of or based on rights arising out of the

13    defendants' liens and claims, not on account of the Common

14    Collateral or based on rights arising out of the Common

15    Collateral.  A party with a lien on the <u>defendants'</u> rights

16    against the debtors could assert that lien against the new

17    common stock to be issued under the plan as the proceeds of its

18    collateral; a creditor, such as the plaintiffs, with a lien on

19    the <u>debtors'</u> assets could not, however, assert a lien against

20    that stock because the debtors' assets -- the Common Collateral

21    -- have not been disbursed or distributed with, or otherwise

22    affected by, the disbursement of the new stock.  The Common

23    Collateral remains, instead, unaffected.  The defendants' lien

24    will change (it, along with the defendants' unsecured claims,

25    will be released under the plan in exchange for the new common

MPM SILICONES, LLC, ET AL.

1    stock); however, the property constituting the Common

2    Collateral will not change. Therefore, the new stock is not

3    proceeds of the Common Collateral.

4           The point can be made from the plaintiffs'

5    perspective, too.  Under the confirmed chapter 11 plan, the

6    first and 1.5 lien holders continue to retain their liens on

7    all of the Common Collateral.  That collateral will not have

8    been diminished one iota by the distribution of new stock under

9    the plan to the defendants.  Indeed, the distribution of that

10   stock and the related discharge of debt owed to the second lien

11   holders improves the rights of the first and 1.5 lien holders

12   in the Common Collateral because the plaintiffs will no longer

13   have to worry about any second lien holder exercising any

14   rights in respect of such collateral.  But, more importantly,

15   the property constituting the Common Collateral has stayed the

16   same.  There has been no economic event altering the nature of

17   those assets that gives rise to proceeds.  Instead, the

18   defendants now have a right to receive new stock in the

19   reorganized enterprise in return for the discharge of their

20   prior liens and claims; the debtors have not received such

21   stock in lieu of any Common Collateral, which fully remains,

22   again, subject to the plaintiffs' liens.

23          As stated in Official Comment 13 to New York U.C.C.

24   section 9-102(a)(64), the amended definition of "proceeds" was

25   intended to address cases that had too narrowly read the prior

MPM SILICONES, LLC, ET AL.

1    definition in U.C.C. section 9-306.  As discussed in a seminal

2    article that influenced, as well as was influenced by, the

3    effort to amend the U.C.C.'s definition of "proceeds," R.

4    Wilson Freyermuth, "Rethinking Proceeds:  The History,

5    Misinterpretation and Revision of U.C.C. Section 9-306," 69

6    Tul. L. Rev. 645 (1995), "proceeds" of collateral should

7    include in an economic sense whatever results from the

8    transformation of collateral; or, as Freyermuth states, "In an

9    economic sense, the term 'proceeds' properly includes whatever

10   assets the debtor receives by virtue of an event that exhausts

11   or consumes some of the collateral's economic value or

12   productive capacity."  Id. at 667.

13          That would include, as specifically addressed by

14   subsection (E) of the definition in U.C.C. section 9-

15   102(a)(64), insurance, which some cases had excluded from the

16   prior definition; or, in subsection (D), rights based on

17   nonconformity, interference with the use of, or defects, or

18   infringement of rights in, or damage to, collateral; or, in

19   fact, anything that reflects a change in the collateral, as the

20   collateral proceeded from one form of economic value to

21   another.  Underlying this common-sense approach is the notion

22   that the secured creditor bargained for a lien on a piece of

23   property.  If that property is altered, the secured creditor is

24   entitled to it in its altered form, as collateral proceeds if

25   the parties' intended the lien to extend to proceeds.  Thus, if

MPM SILICONES, LLC, ET AL.

1   collateral is damaged, the secured creditor's lien should

2   extend to its proceeds in the form of insurance, and if the

3   value of collateral in the form of intellectual property is

4   reduced by infringement, the secured creditor's lien should

5   extend to the debtor's infringement claim, as proceeds.

6        Thus, for example, the definition enacted in U.C.C.

7   section 9-102(a)(64) would overrule Hastie v. FDIC, 20 F.3d

8   1042 (10th Cir. 1993), which held that stock dividends would not

9   constitute proceeds of a lien on stock although the value of

10  the stock was clearly reduced by the dividend.  See Official

11  Comment 13(a) to N.Y. U.C.C. section 9-102(a)(64).

12       Here, the Common Collateral has not changed in any way

13  as a result of the issuance and distribution of the new stock.

14  Therefore, to argue that the new stock received by the

15  defendants constitutes the proceeds of the first and 1.5 lien

16  holders' collateral would unfairly add to such collateral, the

17  value of which obviously dilutes the value of the new stock,

18  whereas the issuance of the new stock does not dilute the value

19  of the Common Collateral. See Beal Bank, S.S.B. v. Waters Edge

20  Ltd. P'ship, 248 B.R. 668, 679-90 (D. Mass 2000) (transfer of

21  equity in the debtor is not a sale of property subject to a

22  lien on debtor's assets).

23       To hold otherwise, as pointed out by the defendants'

24  reply brief, also would contradict the case law addressing

25  whether a secured creditor receives the "indubitable

1    equivalent" of its secured claim under section

2    1129(b)(2)(A)(iii) of the Bankruptcy Code if it receives stock

3    in the reorganized enterprise as part of cramdown treatment

4    under a chapter 11 plan.  See, e.g., In re San Felipe @ Voss,

5    Ltd., 115 B.R. 526, 531 (S.D. Tex. 1990); 7 Collier on

6    Bankruptcy, par. 1129.04[2][c] (16th ed. 2014) at 1129-129.

7    Obviously, if the stock were collateral proceeds to which the

8    creditor's lien would attach, it would not be substitute

9    collateral appropriate for analysis under the "indubitable

10   equivalent" cramdown alternative in section

11   1129(b)(2)(2)(A)(iii).  Very clearly, however, a secured

12   creditor is not getting the proceeds of its collateral when it

13   gets stock in the reorganized entity, unless, of course, that

14   stock was paid by a third-party buyer in return for the

15   debtor's assets comprising the collateral.  See 124 Cong. Rec.,

16   H11,104 (Daily Ed. Sept. 28, 1978).

17        I therefore will dismiss the complaints' claim

18   premised on the alleged breach of section 4.2 of the

19   Intercreditor Agreement arising from the defendants' receipt

20   and retention of new common stock as their distribution under

21   the chapter 11 plan, because such stock is neither Common

22   Collateral nor the proceeds of Common Collateral. Given that

23   conclusion, I do not need to consider the defendants' other

24   arguments in support of their request to dismiss this claim.

25        The complaints also assert a breach of the implied

MPM SILICONES, LLC, ET AL.

1    covenant in every New York contract of good faith and fair

2    dealing.  The parties agree, though, that this claim survives

3    only if there is a relevant ambiguity in the Intercreditor

4    Agreement that might give rise to such a duty or if the ICA

5    imposes a duty on the defendants although not necessarily

6    expressly states such a duty, for example, a duty not to

7    violate the spirit of the ICA or not to thwart its operation.

8          To the extent that I have interpreted the plain

9    meaning of the Intercreditor Agreement to preclude the

10   plaintiffs' claims, therefore, I also dismiss their claims for

11   breach of the duty of good faith and fair dealing.  That would

12   apply to my rulings on the alleged breaches of ICA section 4.2

13   based on the defendants' receipt and retention of new common

14   stock under the plan and the $30 million backstop charge, as

15   well as my ruling on the alleged breach of ICA section 3.1(c)

16   based on the defendants' objection to the plaintiffs' make-

17   whole and related claims and their support of confirmation of

18   the chapter 11 plan.

19         Otherwise the plaintiffs' breach of good faith and

20   fair dealing claims would survive to the extent that I found

21   any ambiguity in the ICA or a violation of the spirit of the

22   ICA.  However, because I have dismissed the complaints'

23   remaining claims because they were stated in no more than a

24   conclusory fashion, I also will dismiss the related breach of

25   good faith and fair dealing claims.  I will, however, give the

MPM SILICONES, LLC, ET AL.

1   plaintiffs thirty days to move under Fed. R. Bankr. P. 7015 to

2   amend their complaints in respect of the claims that I have

3   dismissed solely on the basis of <u>Twombly</u>, <u>Iqbal</u> and <u>L-7</u>

4   <u>Designs</u>.  Such motion should attach the proposed amended

5   complaint as an exhibit.  The remaining good faith and fair

6   dealing claims will be evaluated if the plaintiffs' file such

7   Rule 15 motions.

8          Again, however, I will not permit a motion to amend

9   those claims where I found another basis for dismissal, which

10  are dismissed with prejudice. Counsel for the defendants should

11  submit a proposed order consistent with this ruling, having

12  first circulated it to counsel for the plaintiffs.[1]

13  Dated:  White Plains, New York
               October 14, 2014
14
                              /s/ Robert D. Drain
15                            United States Bankruptcy Judge

16

17

18

19

20

21

22

23

24  [1] The motions also assert that the Court does not have in personam
    jurisdiction over some or all of the defendants. Because the defendants have
    not provided factual support for that assertion, however, this ruling is
25  without prejudice to any party's arguments regarding in personam
    jurisdiction.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25